IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

BRIAN DOYLE,

                    Plaintiff,

v.                                                    Case No. 19-cv-1210-NJR

STEPHEN RITZ and WEXFORD
HEALTH SOURCES, INC.,

                    Defendants.

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Plaintiff Brian Doyle, an inmate of the Illinois Department of Corrections ("IDOC") currently incarcerated at Menard Correctional Center ("Menard"), brought this action pursuant to 42 U.S.C. § 1983 for deliberate indifference in the treatment of his chronic occipital infection (Doc. 9). He was allowed to proceed on claims against Stephen Ritz and Wexford Health Sources, Inc. ("Wexford").

This matter is now before the Court on a motion for summary judgment filed by Stephen Ritz and Wexford (Docs. 94, 95, 98). Doyle filed a response (Doc. 99), and Defendants filed a reply brief (Doc. 101). Doyle subsequently filed a response to Defendants' reply brief (Doc. 102) and a motion to supplement his response (Doc. 103). Defendants also filed a motion to strike two of Doyle's exhibits(Doc. 100).

### BACKGROUND

On November 4, 2019, Doyle filed his Complaint alleging deliberate indifference

in the treatment of his occipital[1] infection (Doc. 1). He was allowed to proceed on the

following three counts against Stephen Ritz and Wexford:

**Count 1:**     Eighth Amendment claim against Defendants for denying numerous requests for referrals of Doyle to an outside wound specialist or plastic surgeon for treatment of his chronic occipital infection beginning in 2018.

**Count 2:**     Eighth Amendment claim against Defendants for their policy, custom, or practice of ignoring the professional recommendations of onsite and offsite medical providers for treatment of Doyle's chronic occipital infection since 2018.

**Count 3:**     Eighth Amendment claim against Defendants for failing to take steps to place Doyle in living conditions aimed at reducing his exposure to additional infection (e.g., single cell with additional access to showers, hygiene items, and cleaning supplies).

(Doc. 9, p. 3).

Doyle suffers from chronic occipital infections. On November 14, 2016, Dr. Ritz

approved a request for a general surgery consult for occipital scalp cysts/abscesses

(Doc. 98, p. 9). On December 22, 2016, Doyle saw Dr. Stacy Stratmann for a surgical

consult (*Id*. at pp. 10-13). Dr. Stratmann identified chronic scalp cysts with intermittent

draining from several areas (*Id*. at p. 10). She indicated that "closure [would] be an issue"

and recommended that Doyle be evaluated by a plastic surgeon (*Id*. at pp. 13-14). On

January 27, 2017, Dr. Garcia—in collegial with Dr. Trost—approved the recommendation

for a plastic surgery consult (*Id*. at pp. 15-16). On February 24, 2017, Doyle was evaluated

by Dr. Renaker-Jansen at Lincoln Surgical Center (*Id*. at pp. 25-27). The surgeon did not

---

[1] "Of or relating to the back of the head or skull." *Occipital*. DICTIONARY.COM. http://www.dictionary.com/browse/occipital (last visited Feb. 8, 2023).

recommend surgery but instead prescribed a medical body wash and Doxycycline (*Id.* at p. 27). The surgeon prescribed a "conservative treatment for now." (*Id.*).

On March 2, 2017, Dr. Ritz reviewed Doyle's file for a potential follow-up appointment with the plastic surgeon (Doc. 99-1, p. 4). The referral for a follow-up was denied in favor of evaluation by Dr. Trost to ensure the current treatment was controlling Doyle's symptoms (*Id.* at pp. 4, 6, 8). Doyle's case was revisited on April 3, 2017, and Dr. Ritz recommended that Doyle's current treatment plan continue (*Id.* at pp. 5, 9, 12). Dr. Ritz noted that the file would be revisited in one month (*Id.*). The review also notes that a follow-up appointment could be reconsidered if Doyle's symptoms worsened (*Id.* at p. 9). On November 3, 2017, Dr. Ritz and Dr. Trost again discussed a collegial review request for an outpatient office visit (Doc. 98, p. 17; 99-1, p. 15). Dr. Ritz decided to pursue an alternative plan of evaluating Doyle on site and continuing with the current treatment because it appeared effective at managing Doyle's symptoms (Doc. 98, p. 17). Dr. Ritz noted that the request would be revisited in one month (*Id.*).

On June 27, 2018, Doyle reported to the nurse that his neck and back of his head were starting to swell again (Doc. 98, p. 62). He was provided with Bactrim, and a culture was sent to the lab (*Id.* at pp. 63-64). On June 30, 2018, he was examined by a medical doctor who noted the skin fold thickness was causing the hair on his neck to turn inwards (*Id.* at p. 65). He was prescribed daily dressing changes and antibiotics (*Id.*). He had a follow-up on July 3, 2018, which noted minimal improvement (*Id.*). On July 6, 2018, Doyle's culture was positive for Methicillin-resistant Staphylococcus aureus (MRSA), and he was started on new medication to treat the infection (*Id.* at p. 66). Dr. Siddiqui met

with Doyle on July 11, 2018, and noted Doyle's past of chronic hidradenitis folliculitis (*Id*. at p. 67). Doyle was referred to collegial review for an excision of the wound (*Id*.).

Medical records from July 24, 2018, note that Dr. Ritz had not yet approved the proposed referral and sought an alternative treatment plan ("ATP") to review at the next collegial (*Id*. at p. 68). A similar note was entered on August 14, 2018, noting that Dr. Ritz authorized an ATP of daily wash of the area with chlorhexidine soap and a round of Doxycycline (*Id*. at p. 69). Dr. Ritz ultimately denied the request for a referral to a plastic surgeon in favor of the more conservative course of treatment, noting that such management was recommended by the surgeon (*Id*. at pp. 68-69).

On August 28, 2018, Doyle met with the nurse practitioner (*Id*. at p. 70). He noted that he previously had the wounds cut open and drained in 1999 and 2000, but the infection never went away entirely (*Id*.). He demanded a single cell. The nurse practitioner noted no sign of edema, cellulitis, or drainage (*Id*.). Doyle was ordered to continue on his current treatment plan. On September 27, 2018, Dr. Ritz discussed Doyle's condition with Dr. Siddiqui and noted that Doyle had no open areas during the previous exam. Dr. Ritz directed that the current plan continue, and the possible referral could be re-visited should the wounds re-open (*Id*. at p. 73).

During Doyle's daily head cleanings on October 1, 2018, the nurse noted that his wounds were opening back up (*Id*. at p. 71). The nurse noted swelling on his face from fluid build-up and that the back of his neck was hard and swollen (*Id*.). On October 3, 2018, Dr. Shah performed an incision and drainage of the wound; the wound also was cultured (*Id*. at p. 72). On October 12, 2018, the nurse practitioner reviewed the culture

with Doyle and directed him to continue with his current treatment (*Id*. at p. 74). The nurse practitioner later noted that based on his labs, Doyle had uncontrolled blood pressure and blood sugars, but that Doyle refused insulin and medications (*Id*. at p. 75; Doc. 99-1, p. 57). On October 19, 2018, Dr. Siddiqui noted that the drainage of Doyle's wounds had stopped, and his antibiotics were discontinued (Doc. 98, p. 76). Dr. Siddiqui referred Doyle for collegial review for a possible skin fold lift and deep cleaning (*Id*.).

Dr. Ritz reviewed the request for evaluation by a surgeon, but instead sought an ATP for a repeat of Doyle's A1C levels (*Id*. at p. 77). Doyle had a history of issues with his blood sugar levels and was labeled as having poor compliance with his diet (*Id*. at pp. 28-30). On November 6, 2018, he presented to the nurse practitioner with a worsening infection and was admitted to the infirmary (*Id*. at p. 77). On December 17, 2018, Doyle's case was presented to collegial review for possible outside evaluation (*Id*. at p. 22). Dr. Ritz noted that the infection was recurrent for 20 years and that Doyle had an incision and drainage in both 1999 and 2010 (*Id*.). Dr. Ritz noted that despite the recommended conservative management, there was "no improvement" with chlorhexidine soap for several years, daily dressing changes, and multiple trials of Minocycline, Levaquin, and Bactrim (*Id*.). Dr. Ritz and Dr. Siddiqui agreed that the Doxycycline should continue for three to four months because there was no obvious abscess at the time, and Doyle's A1C was not controlled (*Id*.).

In February and March 2019, Doyle was seen by the nurse practitioner who noted that his A1C levels had actually increased and that he still had uncontrolled hypertension and diabetes (*Id*. at pp. 19-20). On March 22, 2019, Dr. Meeks conducted a review of Dr.

Ritz's denial of a plastic surgeon consult in December (*Id*. at p. 23). Dr. Meeks approved Doyle for an evaluation by a surgeon (*Id*.). On June 20, 2019, Dr. Diaz evaluated Doyle for surgery on his scalp (*Id*. at pp. 36-44). Dr. Diaz noted that Doyle had poorly controlled diabetes and hypertension and that the previous consult with plastic surgery had noted that resection of the area would lead to problems closing the wound (*Id*. at p. 36). Dr. Diaz ordered an ultrasound to assess fluid collection, noting that an incision and drainage of the wound would be needed if fluid was present (*Id*. at p. 39). Dr. Diaz noted that long-term, Doyle would need resection of the infected skin to resolve the chronic condition but noted that closure would be difficult and would require extensive plastic surgery (*Id*.).

An ultrasound of the area noted subcutaneous fluid collection, and Dr. Diaz recommended incision and drainage (*Id*. at p. 41, 43, 45). Dr. Ritz approved the surgery (*Id*. at p. 46). On September 12, 2019, Dr. Diaz performed the procedure, but no fluid was found at that time (*Id*. at pp. 47-48). Instead, Dr. Diaz performed an exploration of the mass and took biopsies and cultures (*Id*. at p. 47). The biopsies and cultures were unremarkable (*Id*. at p. 51). Dr. Diaz labeled Doyle's condition as "probably chronic hidradenitis" and recommended a plastic surgeon review his case for management (*Id*.). Dr. Diaz noted that he gave Doyle the option "of doing a wide excision and leaving the wound open and then we could manage him in the wound care center and possibly do a skin graft remotely later. This would require him to have weekly visits to the wound care center and it may be months before we can get his wound healed." (*Id*.).

Doyle was referred to a plastic surgeon, and the consult was approved by Dr. Fisher (*Id*. at pp. 50, 52). On December 11, 2019, Doyle met with Dr. Rivera-Serrano

for a plastic surgery consult (*Id*. at p. 54). He recommended an MRI for further diagnosis and treatment (*Id*.). Dr. Rivera-Serrano noted he was hesitant to conduct surgery because a lipoma or cyst should not cause pain and the surgery might not improve his symptoms, including his complaints of pain (*Id*.). The MRI was approved by Dr. Ritz (*Id*. at p. 55). On January 21, 2020, Doyle had an MRI which showed non-specific soft tissue with no fluid collection (*Id*. at p. 152-53).

From February 2020 to June 2020, there were no reports of issues with Doyle's condition (*Id*. at pp. 87-108). On June 28, 2020, Doyle presented to the nurse for renewal of his shampoo due to "small bumps on the back of his head" (*Id*. at p. 110, 113). He was started on an antibiotic, as well as the shampoo (*Id*. at p. 113). On July 8, 2020 he noted that he was placed on an antibiotic "over and over and it never works." (*Id*. at p. 115). He was referred to nurse practitioner ("NP") Dearmond who noted that Doyle refused the antibiotic (*Id*.).

On August 19, 2020, Doyle reported to the nurse with head swelling and bumps (*Id*. at p. 127). He refused to sign a consent to be seen at the cell front. On September 5, 2020, he again complained that he needed to be seen by the doctor for his condition but again refused to sign a consent to be seen at the cell front (*Id*. at p. 130). He was referred to the doctor. On September 17, 2020, NP Dearmond saw Doyle for renewal of his medications (*Id*. at p. 136-37). Dearmond renewed the medications and prescribed a wash/rinse of the back of his scalp. Dearmond noted that there were no open lesions, but the scalp did have an abnormal shape (*Id*. at p. 140-41). Dearmond noted the condition as stable but noted that Doyle was upset with the determination and stated that he was not

taking his insulin or meds because of the decision (*Id*. at p. 144). He specifically refused the insulin and Accucheck that date, stating he was not taking the meds "until I get my neck fixed." (*Id*. at p. 147).

On September 19, 2020, a nurse noted the same infection on the back of Doyle's head and referred him to the medical doctor (*Id*. at p. 148). Four days later, Dr. Siddiqui referred him for a consult with a surgeon, and Dr. Ritz approved the referral (*Id*. at pp. 149-150). On January 7, 2021, Doyle met again with Dr. Rivera-Serrano (*Id*. at p. 151). Doyle complained that the mass was growing in size. Given the recurrent nature of his condition, Dr. Rivera-Serrano referred Doyle for a surgical consult at a care facility in St. Louis, Missouri (*Id*. at p. 153).

On March 3, 2021, Doyle met with Dr. Tadisina at the SLUCare Medical Group (*Id*. at p. 160). Dr. Tadisina referred him to dermatology, and Dr. Ritz approved the referral (*Id*. at p. 159). On April 26, 2021, Doyle's condition was reviewed by dermatologist Dr. Guo, who prescribed Doxycycline and a special shampoo (*Id*. at p. 164). A punch biopsy of the area was taken, and he was diagnosed with acne keloidalis (*Id*. at p. 155, 165). During an appointment with the nurse practitioner on June 11, 2021, Doyle acknowledged that any surgery to remove the keloid would not be scheduled until his diabetes was under control (*Id*. at pp. 169-170). Doyle was scheduled for a follow-up with the plastic surgeon (*Id*. at p. 171). On June 30, 2021, Doyle met with Dr. Kaswan (*Id*. at p. 177). Doyle noted no improvement, but Dr. Kaswan noted no active infection and that his condition appeared to be managed adequately with oral antibiotics and special shampoo (*Id*. at p. 178). Dr. Kaswan did not recommend surgery, noting that the area was

extensive "and would require a fairly extensive resection which would be much more morbid." (*Id.*). Dr. Kaswan recommended continued nonoperative management (*Id.*).

In August 2021, Doyle was again referred for a dermatology consult (*Id.* at pp. 172-73). On November 11, 2021, Doyle met with PA Spiller at Southern Illinois Dermatology. The records note he had lesions for over 20 years and was currently using hibiclens and T-Gel with no improvement (*Id.* at p. 184). He was recommended for Kenalog injections. Doyle was informed that injections would increase his blood sugar and he would need to monitor his levels (*Id.*). He was also directed to continue with his other medications (*Id.*). As of January 7, 2022, Doyle's glucose levels remain elevated (*Id.* at p. 185).

In addition to the medical records initially cited by the parties, Doyle recently offered an updated medical record from a recent visit to Southern Illinois Dermatology (Doc. 103). On April 21, 2022, Doyle saw physician assistant Spiller for a follow-up after having Kenalog injected into the scalp at the last office visit (Doc. 103, p. 5). Although Doyle noted his scalp was flat with no lesions after the injections, the condition flared up after two months (*Id.*). He informed Spiller that a doctor in Highland, Illinois, talked about surgery to remove the lesions, and Doyle wanted surgery (*Id.*). Spiller confirmed the previous assessment of acne keloidalis and again recommended Kenalog injections (*Id.*). He received 10 injections in his occipital scalp. He also was recommended for a referral for general surgery for lesion removal (*Id.*).

LEGAL STANDARDS

**A. Summary Judgment Standard**

Federal Rule of Civil Procedure 56 governs motions for summary judgment.

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *Archdiocese of Milwaukee v. Doe*, 743 F.3d 1101, 1105 (7th Cir. 2014), citing FED. R. CIV. P. 56(a). *Accord Anderson v. Donahoe*, 699 F.3d 989, 994 (7th Cir. 2012). A genuine issue of material fact remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). *Accord Bunn v. Khoury Enter., Inc.*, 753 F.3d 676, 681-82 (7th Cir. 2014).

In assessing a summary judgment motion, a district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Anderson*, 699 F.3d at 994; *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). As the Seventh Circuit has explained, as required by Rule 56(a), "we set forth the facts by examining the evidence in the light reasonably most favorable to the non-moving party, giving [him] the benefit of reasonable, favorable inferences and resolving conflicts in the evidence in [his] favor." *Spaine v. Community Contacts, Inc.*, 756 F.3d 542 (7th Cir. 2014).

## B. Deliberate Indifference to Medical Needs

Prison officials violate the Eighth Amendment's proscription against "cruel and unusual punishments" if they display deliberate indifference to an inmate's serious medical needs. *Greeno v. Daley*, 414 F.3d 645, 652–53 (7th Cir. 2005) (*quoting Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal quotation marks omitted)). *Accord Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009) ("[D]eliberate indifference to serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution."). A prisoner is entitled to reasonable measures to

meet a substantial risk of serious harm — not to demand specific care. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997).

To prevail, a prisoner who brings an Eighth Amendment challenge of constitutionally-deficient medical care must satisfy a two-part test. *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011) (*citing Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006)). The first prong that must be satisfied is whether the prisoner has shown he has an objectively serious medical need. *Arnett*, 658 F.3d at 750. *Accord Greeno*, 414 F.3d at 653. A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated. *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). *Accord Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (violating the Eighth Amendment requires "deliberate indifference to a substantial risk of serious harm.") (internal quotation marks omitted) (emphasis added).

Prevailing on the subjective prong requires a prisoner to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to inmate health. *Greeno*, 414 F.3d at 653. A plaintiff need not show the individual literally ignored his complaint, just that the individual was aware of the serious medical condition and either intentionally or recklessly disregarded it. *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). The standard is a high hurdle, requiring a "showing as something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012).

ANALYSIS

### A. Motion to Strike (Doc. 100) and Supplemental Filings (Doc. 102 and 103)

In addition to their reply brief, Defendants filed a motion to strike Doyle's Exhibits B and C.

Exhibit B (Doc. 99-2, pp. 48-63) appears to be the expert report of Dr. James Boxer, which was submitted in an unspecified case from the Northern District of Illinois. He is a practicing urologist who offered an expert report on the treatment of kidney stones (*Id.*). Dr. Boxer was not retained as an expert in this case nor was he disclosed as an expert for Doyle (*See* Doc. 100-2, p. 20). *See* Fed. R. Civ. P. 26(a)(2). The time for disclosing an expert has long since passed. Further, it does not appear that Dr. Boxer's report is even relevant to the claims in this case. The report discusses the treatment of kidney stones while the plaintiff in that case was located at Stateville Correctional Center (Doc. 99-2, p. 50). Although the report does mention Wexford guidelines and policies, there is no indication that the same policies are at issue in this case. Furthermore, the policies analyzed by Dr. Boxer are from 2009-2010. The Court fails to see how the report is in any way relevant to Doyle's claim regarding his medical care that started in 2018. Thus, Exhibit B is **STRICKEN** from the docket.

Exhibit C includes Wexford's provider handbook as well as guidelines for oral health (Doc. 99-2, pp. 65-99). The guidelines are from 2006 and 2007. There is no indication that these guidelines were even in place when Doyle started receiving care, nor are guidelines about dental care relevant to the policy claims against Wexford in this case. Thus, Exhibit C is also **STRICKEN** from the docket.

Turning to Doyle's supplemental filings, after filing a responsive brief, Doyle subsequently filed a motion in opposition to Defendants' reply brief (Doc. 102). In essence, he filed a sur-reply to respond to the arguments in Defendants' reply brief. Such a filing is not allowed by the Court's Local Rules. *See* SDIL Local Rule 7.1(c) ("Under no circumstances will sur-reply briefs be accepted."). Further, the brief does not appear to address any new authority due to a change of law or fact which would warrant a supplement to Doyle's original brief. Thus, his "motion in opposition" (Doc. 102) is improper and is **STRICKEN** from the docket.

Doyle's motion to supplement (Doc. 103) seeks to add updated medical records, including a visit to the dermatologist on April 21, 2022. The Court **GRANTS** Doyle's motion and will consider the updated medical records with the motion.

### B.  Medical Care

#### a.  Stephen Ritz (Count 1)

As to Count 1, Doyle alleges that Dr. Ritz delayed treatment for his condition by denying numerous requests for referrals to an outside wound specialist or plastic surgeon for treatment of his chronic condition beginning in 2018. After his consultation with Dr. Renaker-Jansen in February 2017, Doyle maintains that Dr. Ritz denied requests for follow-up appointments, citing to denials from March 2017 until September 2018. (Docs. 99-1, p. 4-6, 8-9, 12, 15, 32-37, 41-42, 47). Doyle argues that Dr. Ritz persisted in an ineffective course of treatment for months and refused to send him for another consultation, even when informed that the alternative plan failed.

Denying or delaying appropriate care can violate the Eighth Amendment. *Howell*

*v. Wexford Health Sources, Inc.*, 987 F.3d 647, 653 (7th Cir. 2021) (citing *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008) (plaintiff stated plausible claim for deliberate indifference where jury could find that guards needlessly delayed treatment of plaintiff's broken nose for a day and a half); *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007) (plaintiff stated plausible claim for deliberate indifference where he was needlessly denied treatment for painful dislocated finger for two days)). *See also Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010) ("A significant delay in effective medical treatment may…[constitute] deliberate indifference….where the result is prolonged and unnecessary pain."). A plaintiff must provide evidence, however, that the defendant's failures caused his injury or pain. *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013). "In cases where prison officials delayed rather than denied medical assistance to an inmate, courts have required the plaintiff to offer 'verifying medical evidence' that the delay (rather than the inmate's underlying condition) caused some degree of harm. That is, a plaintiff must offer medical evidence that tends to confirm or corroborate a claim that the delay was detrimental." *Jackson*, 733 F.3d at 790 (internal citations omitted). *See also Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019).

When Doyle was seen by the plastic surgeon in February 2017, Dr. Renaker-Jansen noted that although his cysts intermittently swelled and drained, at the time of the examination, Doyle had no signs of abscesses or cellulitis (Doc. 98, p. 24). Instead, Dr. Renaker-Jansen found that surgical intervention was not needed and prescribed a treatment of hibiclens body wash and Doxycycline (*Id.* at p. 27). Dr. Renaker-Jansen directed that treating staff try a conservative treatment first. Thus, when Doyle's case was

presented to Dr. Ritz in collegial review in March and April 2017, Doyle was directed to start with the conservative treatment to determine if it could manage his symptoms (Doc. 99-1, pp. 4-5, 8-9). There is nothing in the records to suggest that this decision was "a substantial departure from accepted professional judgment, practice, or standards" because it was the treatment ordered by Dr. Renaker-Jansen. *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008).

Doyle argues, however, that Dr. Ritz continued with the treatment even when it was ineffective. He continued to deny requests to return for a follow-up with a specialist (Doc. 99-1, p. 4-6, 8-9, 12, 15, 32-37, 41-42, 47). Doyle also points to a referral written by Dr. Siddiqui on September 26, 2018, which sought an evaluation of his condition, noting that the alternative treatment plan "failed" (*Id*. at p. 45). Dr. Ritz reviewed the request, noting there was no improvement despite conservative treatment measures (*Id*. at p. 47). Dr. Ritz conferred with Dr. Siddiqui and determined that there were no open wounds that could be treated by the wound care clinic (*Id*.).[2] Dr. Ritz directed Dr. Siddiqui to continue treatment onsite and to re-present for a wound care evaluation if the wounds re-opened. (*Id*.). Dr. Ritz also continued to deny Doyle a follow-up appointment in part because his A1C levels were not controlled (*Id*. at p. 67-68, 75-76). Doyle argues that it was not until Dr. Ritz's decision to continue with conservative treatment was appealed that Dr. Meeks finally approved Doyle for an evaluation by a surgeon (Doc. 99-1, p. 83,

---

[2] According to the form, the initial collegial review deferred a treatment decision until Dr. Ritz was able to speak with Dr. Siddiqui. That initial review took place on September 28, 2018, at 3:44 p.m. (Doc. 99-1, p. 47). But the appeal is marked as being filed on September 28, 2018, at 2:47 p.m. (*Id*.). It is not clear when Dr. Ritz discussed Doyle's case with Dr. Siddiqui.

85). Dr. Meeks agreed that Doyle needed definitive treatment and authorized an appointment with a general surgeon/plastic surgeon (*Id.*).

From the records, there is some evidence of delay by Dr. Ritz. He continued to prescribe the alternative treatment plan even after being informed that the treatment failed. But in addition to the delay, Doyle must show with verifying medical evidence that the delay had a detrimental effect on his condition. *Walker*, 940 F.3d at 964 (In cases "where the plaintiff alleges the defendant delayed, rather than denied, medical treatment…[the Seventh Circuit has] required the plaintiff present 'verifying medical evidence' that the delay, and not the underlying condition, caused some harm."). There is no such evidence in the record.

In fact, subsequent surgeons prescribed the same treatment as Dr. Ritz. Dr. Diaz did order an incision and drainage (Doc. 98, p. 45), but when he performed the procedure, no fluid was found (*Id.* at p. 48). Further, he continued with the prior treatment of a course of Doxycycline (*Id.*). Doyle was also not a good candidate for additional surgery given his uncontrolled diabetes, and he was informed that surgery could lead to problems with healing (*Id.* at pp. 51, 54). Dr. Rivera-Serrano also noted that his masses should produce no pain, and surgery might not improve his condition (*Id.* at p. 54). In fact, each outside specialist Doyle saw for his condition cautioned against surgery and instructed to continue with the alternative treatment plan Dr. Ritz implemented (Doc. 99-2, pp. 20, 40; Doc. 103, p. 5). Again, Dr. Kaswan, a doctor with Saint Louis University Plastic Surgery Division, noted on June 30, 2021, that his condition was extensive and that surgery would require a "fairly extensive resection which would be much more morbid" (*Id.* at p. 20).

He also recommended continuing with "nonoperative management" (*Id.*). Nothing in the record indicates that the delay in follow-up with a specialist was detrimental to his condition because those specialists prescribed the exact treatment Dr. Ritz provided.

In his supplement, Doyle points to an office visit at Southern Illinois Dermatologist from April 21, 2022 (Doc. 103, pp. 4-6). Doyle argues that the records show he was recommended for surgery. But the records actually indicate that Doyle, himself, requested approval for a visit with a doctor in Highland, presumably Dr. Diaz, and the provider recommended the referral as only a general surgeon could perform the surgery (Doc. 103, p. 5). Nothing in the record suggests that surgery was *required* or that non-surgical treatments fell outside of the professional standards. Even Dr. Diaz noted that a surgical option would be extensive, requiring the wound to remain open and cared for by the wound care center until a skin graft could be placed (Doc. 98, p. 51). Dr. Diaz noted that the surgical option would require weekly care, and it may be months before the wound healed (*Id.*). Dr. Diaz also referred Doyle to a plastic surgeon who ultimately cautioned *against* surgery (*Id.* at p. 54). Thus, nothing in the record supports Doyle's claim that he needs surgery.

Further, the evidence in the record suggests that Dr. Ritz continued to monitor Doyle's condition. He reviewed the requests and the current state of his care on several occasions. Additional treatment was provided at the facility, including an incision and drainage (*Id.* at p. 72). When Doyle's condition worsened at one point, he was provided with additional care in the infirmary (Doc. 99-1, p. 68). The records also reflect that Doyle's condition did improve at times, which is the nature of his condition (*Id.* at p. 71-

72). Dr. Ritz also requested to monitor Doyle's A1C levels because he was not a surgical candidate with his uncontrolled diabetes (*Id.* at p. 64, 74, 76; Doc. 98, p. 161). Thus, the evidence suggests that Dr. Ritz did not act with deliberate indifference during the delay but continued to prescribe Doyle care and monitor his condition and A1C levels before sending him to a specialist. He also later approved a number of follow-up visits and procedures for Doyle's continued care (*See* Doc. 98, pp. 85, 150, 156, 159). The Court defers to a provider's medical judgment unless "there is evidence that 'no minimally competent professional would have so responded under those circumstances.'" *Walker*, 940 F.3d at 965 (quoting *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014)). There is simply no evidence in the record to suggest that Dr. Ritz's actions fell below that standard or that any delay caused him harm. Thus, Dr. Ritz is entitled to summary judgment on Count 1.

### b. Wexford (Count 2)

Doyle's claim against Wexford alleges that Wexford had a policy, custom, or practice of ignoring the professional recommendations of onsite and offsite medical providers. When it comes to a municipal government or a corporate entity like Wexford, they cannot be held liable on a simple supervisory liability. *Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014) (citing *Iskander v. Village of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982)). Instead, Doyle must show that the violation of his constitutional rights was caused by "(1) an express government policy; (2) a widespread and persistent practice that amounted to a custom approaching the force of law; or (3) an official with final policymaking authority." *Howell*, 987 F.3d at 653 (citing *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690-91 (1978); *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372,

379 (7th Cir. 2017)).

Doyle offers no evidence of such a policy or procedure. In his response brief, he merely states that the evidence will show that Wexford had a policy and practice of ignoring professional recommendations from their medical director and nurse practitioner (Doc. 99, p. 7). He takes issue with the span of time between March 2017 and September 2018 when Dr. Ritz denied requests for follow-up appointments in the collegial review process (Docs. 99-1, p. 4-6, 8-9, 12, 15, 32-37, 41-42, 47). Although repeated actions that a plaintiff himself experienced can be used to demonstrate institutional liability, it is more difficult "because what is needed is evidence that there is a true…policy at issue, not a random event." *Grieveson*, 538 F.3d at 774 (quotations omitted); *Howell*, 987 F.3d at 654-55. Doyle did have a number of follow-up requests denied in collegial review in favor of a conservative, alternative treatment plan, but he also had a number of follow-up visits approved by Dr. Ritz in collegial review. Dr. Ritz approved Doyle for procedures and follow-up visits with additional surgeons based on offsite provider's recommendations (Doc. 98, pp. 45-46, 53, 55, 83, 85, 156, 159). Further, other Wexford officials approved procedures and care in the collegial review process. *See* Doc. 98, p. 16 (Dr. Garcia approved plastic surgery consult), p. 17 (Dr. Smith approved referral for plastics follow-up on appeal from Dr. Ritz collegial review denial), p. 23 (Dr. Meeks approved referral for general surgery evaluation on appeal from Dr. Ritz collegial denial), p. 52 (Dr. Meeks approved plastic surgeon evaluation). Thus, there is no evidence of a custom or practice of ignoring professional recommendations.

Nor has Doyle pointed to any other inmates who were denied follow-up visits

with professionals or an express policy of Wexford's to deny such outside care. *Grieveson*, 538 F.3d at 774 (no evidence "that the alleged practice was widespread and reflective of a policy choice"). Doyle's broad statement that Wexford had a practice of ignoring professionals' recommendations is not enough. *Id.* ("One broad, vague statement about an occurrence affecting other inmates…does not support the inference of a 'widespread' custom."). Instead, the medical records demonstrate that Doyle's condition was constantly monitored by Dr. Ritz, other collegial review officials, doctors, and nurse practitioners at the prison. Dr. Ritz approved follow-up appointments on numerous occasions and approved requests for procedures and tests by outside medical providers. Other Wexford officials approved recommended procedures and approved appeals from Dr. Ritz. There is simply no evidence of a policy or practice in place to deny care. Thus, Wexford is also entitled to summary judgment.

### C. Conditions of Confinement

As to Doyle's claim in Count 3—that Defendants failed to take steps to place Doyle in living conditions aimed at reducing his exposure to additional infection—Doyle fails to offer any evidence regarding this claim. There are notations in the medical records where Doyle asked to be single-celled, but there is simply no evidence in the record to indicate that a single-cell was medically necessary. Nor is there any evidence to suggest that any of the specialists that he saw ordered special accommodations to treat his condition. There is simply no evidence to support Doyle's contention that he needed special cell conditions in order to reduce his exposure to infection. Thus, Defendants are entitled to summary judgment on Count 3.

### CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment (Docs. 94, 95) is **GRANTED**. The Clerk of Court is **DIRECTED** to enter judgment accordingly and close this case.

**IT IS SO ORDERED.**

**DATED:   February 8, 2023**

**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**